**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
ASHLEY BELL,                                                        Case No.:

                                   Plaintiff,
                                                                    **VERIFIED COMPLAINT**

                    -against-
                                                                    **PLAINTIFF DEMANDS**
BRITISH EMBASSY and UK DEPARTMENT FOR               **A TRIAL BY JURY**
INTERNATIONAL TRADE,

                                   Defendants.
------------------------------------------------------------------------x

Plaintiff ASHLEY BELL ("Ms. Bell" or "Plaintiff"), by and through her attorneys, White & Hilferty, hereby complains of Defendants BRITISH EMBASSY and UK DEPARTMENT FOR INTERNATIONAL TRADE ("UKDIT") (collectively "Defendants"), upon information and belief as follows:

## NATURE OF THE CASE

1.      Plaintiff brings this action alleging that Defendants have violated the New York State Human Rights Law, N.Y. Exec. Law 290. *et seq.* and the New York City Human Rights Law, N.Y. Admin Code 8-107, *et seq.,* and seeks damages to redress the injuries she has suffered as a result of being discriminated and retaliated against based upon her disability and engagements in protected activity.

## JURISDICTION & VENUE

2.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1330, 1332, and 1441(d) because this Court has original jurisdiction over actions against foreign states.

3.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

## THE PARTIES

4.      Plaintiff was and is a resident of Astoria, New York. During the relevant time period herein, Defendants employed Plaintiff at the UK Department for International Trade located at 885 2nd Ave., New York, NY 10017.

5.      Defendant British Embassy is Her Majesty's Government Department assigned to oversee business conducted in the United States. During her employment, Plaintiff's paystubs state "British Embassy" as the employer. Defendant British Embassy employed Plaintiff at the UKDIT located at 885 2nd Ave., New York, NY 10017. Defendant British Embassy's registered business address is 3100 Massachusetts Ave, N, Washington, DC 20008.

6.      Defendant UKDIT employed Plaintiff at 885 2nd Ave., New York, NY 10017.

7.      Upon information and belief, Defendant British Embassy and Defendant UKDIT are interchangeable.

## MATERIAL FACTS

8.      Plaintiff is a female who suffers from Dyslexia and chronic migraines with auras. During the relevant time period, Defendants were aware of Plaintiff's disabilities.

9.      During Plaintiff's employment tenure with Defendants, Plaintiff engaged in commercial activities on behalf of Defendants in the United States.

10.      Throughout her employment, Plaintiff performed her job duties in an exemplary manner as evidenced by her satisfactory performance reviews and the promotion she received in April 2019.

11.      On March 13, 2013, Defendant British Embassy hired Plaintiff as a Furnishings Officer for the UK Mission to the UN ("UKMIS").

12.     In April 2017, after undergoing a six-month temporary assignment, Defendant UKDIT hired Plaintiff as a full-time Business Development Associate-Fashion at its New York City location.

13.     Throughout her employment, Plaintiff performed her job duties in an exemplary manner as evidenced by the multiple promotions she received.

14.     As a Business Development Associate, Plaintiff's job duties included, but were not limited to, creating commercial opportunities to enhance British fashion in the United States and facilitated meetings for United States buyers to meet with and purchase UK fashion brands. Furthermore, Plaintiff's summary of duties provided that she was required to "generate buyer relationships at relevant domestic and international trade shows [and] commercial business opportunities for US buyers to purchase British fashion products…connect British fashion brands with category buyers at major department and independent fashion retailers…attend major fashion industry trade events…generate leads for US investors into UK retail climate and new UK fashion exporters to US…assist UK brands with expansion into US market…organize US buyer trips…promote the sale of British fashion products…"

15.     In 2018, Defendants provided Plaintiff with an Employment Handbook, which stated, in relevant part, "[t]he US Network makes every effort to comply with US Equal Employment Opportunity laws, and will not deny employment based on race, sex, religion, gender, sexual orientation, ethnicity, national origin, age disability or color, or any other protected category as defined by local, state, or federal laws." These policies were in place at the time Plaintiff was hired.

16.     In April 2019, Defendants promoted Plaintiff to Vice Consul-Fashion & Retail. Notably, Plaintiff underwent an eight-month process to receive this promotion.

17.     As Vice Consul, Plaintiff's job duties included, but were not limited to, leading the creation of commercial opportunities for British fashion, beauty, and retail products in the eastern United States and act as fashion lead for US-wide activity. Furthermore, Defendants required Plaintiff to, among other things, attend industry networking events, generate sales of British fashion/retail products in the United States, and secure two major United States investment projects into the UK.

18.     Following Plaintiff's promotion, Business Development Associate Stephanie Rothman ("Rothman"), who also applied for the promotion, filed a complaint with Human Resources ("HR") against Manager Rebecca Lewis ("Lewis") and refused to work with Plaintiff. Lewis informed Plaintiff that she did not want to cause tension between Plaintiff and Rothman but failed to ameliorate the situation. Shortly thereafter, Plaintiff began experiencing trouble sleeping and extreme stress because of the situation.

19.     At the end of April 2019, Plaintiff disclosed to Lewis that she suffered from Dyslexia. In response, Lewis discriminatorily stated, "I couldn't tell" and inappropriately disclosed that her brother was also diagnosed with Dyslexia. After Plaintiff disclosed her disability, Lewis commenced a pattern of discriminatory actions against Plaintiff.

20.     In or around the same time, during a meeting with Lewis, Plaintiff engaged in protected activity by mentioning that she consulted with a friend, who is an attorney, in a non-formal fashion due to Lewis' repeated commentary that Rothman may pursue legal action against Plaintiff and UKDIT. Thereafter, Lewis inappropriately reported the situation to HR.

21.     Approximately two weeks later, HR Representative Theresa Sayasithsena ("Sayasithsena") called Plaintiff and repeatedly demanded to know whether Plaintiff had contacted a lawyer. Plaintiff advised that she sought non-formal legal advice. Sayasinthsena then

unjustifiably referred to Plaintiff as "hostile" and advised Plaintiff that per her employee contract, she was bound by a confidentiality clause, which prevented her from discussing her employment with third parties. Subsequently, Director Fiona McLeod ("McLeod") confronted Plaintiff regarding the situation and warned Plaintiff that it was not a "good idea" to speak to an attorney if she wanted to continue her employment with Defendants. Notably, an attorney reviewed Plaintiff's employment contract and determined that she was not bound by a confidentiality clause.

22.     In June 2019, Plaintiff expressed concerns to Defendants about her workload given that her role had transitioned to a management position. During this time, Plaintiff experienced extreme anxiety and panic attacks as a result of the increased workload.

23.     In July 2019, Plaintiff fainted on the sidewalk while walking.

24.     In August 2019, Plaintiff engaged in protected activity by filing multiple complaints with Head of Corporate Services Anna Miller ("Miller") regarding the hostile work environment to which she was subjected by Lewis. Specifically, Plaintiff expressed concern that she was falling behind on sector specific work because of the amount of time she was required to spend in personnel mediation sessions often led by Lewis and/or in tandem with a HR representative. Subsequently, Defendants commenced a pattern of retaliatory actions against Plaintiff.

25.     In August 2019, Plaintiff utilized vacation time to address her mental health. During said time, Lewis harassed Plaintiff about a deadline despite that Lewis knew Plaintiff was out of work on vacation.

26.     On August 19, 2019, Defendants terminated Rothman's employment.

27.     In October 2019, During a Team meeting, Plaintiff requested support on her workload, as well as on two large trade missions that she was responsible for delivering. Plaintiff

then sent a follow up email regarding her request to McLead, Lewis, and Senior Director Dana Dickerson ("Dickerson"). In response, McLeod encouraged Plaintiff to reach out if the situation became "unbearable." Lewis then confronted Plaintiff via telephone and threatened her by stating, "watch what you say" and/or "watch how you say things to Fiona." Subsequently, Plaintiff asked Lewis for assistance including, among other things, posting job openings so that Plaintiff could build her team. However, Plaintiff only received assistance from temporary employees and therefore, felt physically and mentally run down, experienced dizzy spells, and noticed changes in her vision.

28.    Subsequently, Defendants assigned a temporary employee to assist Plaintiff one day per week. Plaintiff expressed to Lewis that she did not feel as though assigning her an assistant one day per week constituted adequate support and that said employee's assignment to work on leads for investment targets did not alleviate Plaintiff's workload issue. Plaintiff also requested that a senior manager advertise for Rothman's position; however, Lewis claimed that senior leadership did not want to hire someone before the holidays and would look into the matter after January 2020. Significantly, Defendants later reprimanded Plaintiff for failing to post to job "quick enough."

29.    In February 2020, Plaintiff interviewed a candidate to replace Rothman. During said interview, Lewis forced her way onto the panel, harassed Plaintiff, and made discriminatory comments about the candidate's hands, which had visible scars and/or birthmarks, describing them as "creepy." Lewis then pretextually accused Plaintiff of making significant mistakes, which Lewis claimed had "legal implications."

30.    In March 2020, Plaintiff again expressed concerns to Lewis regarding her workload. In response, Defendants assigned Page Allen ("Allen") to assist Plaintiff; however,

MacLeod, who was Allen's supervisor, interfered and refused to allow Allen to assist Plaintiff. Plaintiff then complained to Lewis regarding the lack of support received. In response, Lewis discriminatorily accused Plaintiff of pretextual performance deficiencies and scolded Plaintiff for struggling to complete her workload. Subsequently, Lewis instructed Plaintiff to speak with the Deputy Consul General Laura Hickey ("Hickey"), who was the Senior Policy Advisor's supervisor, to sort out purported performance issues related to briefing packets and insisted that said conversation be a formal disciplinary conversation.

31.     Subsequently, Plaintiff met with Hickey, who agreed with Plaintiff that there were miscommunications between Plaintiff and Lewis and stated that Plaintiff was not the only staff member to report concerns with their Senior Policy Advisor. Hickey also stated that there needed to be clarification with the Senior Policy Advisor and Plaintiff's department regarding the Senior Policy Advisor's role.

32.     During Spring 2020, Plaintiff experienced migraine symptoms and utilized sick time on a Friday. During the following week, Lewis questioned how Plaintiff completed her work and met deadlines that were due on said the Friday she was out sick. Plaintiff reminded Lewis she was out sick on said date. Ultimately, Plaintiff was diagnosed with chronic migraines with auras.

33.     In May 2020, Lewis retaliated against Plaintiff by placing her on a Performance Development Plan ("PDP") based upon pretextual performance-related accusations, as well as the purported interaction during the interview panel in February 2020. During a call regarding the PDP, Lewis acted aggressive towards Plaintiff, which caused Plaintiff to become emotional. Plaintiff reminded Lewis of her Dyslexia and the multiple complaints she made regarding her workload. Significantly, Lewis failed to provide Plaintiff with written documentation regarding the PDP and withheld positive feedback that she (Lewis) received from other staff members

regarding Plaintiff's work, including positive comments from Allen. When Plaintiff asked for further feedback to corroborate the performance allegations, Lewis refused to provide said information. When Plaintiff attempted to speak with Mentor Richard Powell ("Powell") regarding the situation, Lewis intervened and reported her manufactured version of the events to Powell. When Powell spoke with Plaintiff, he relayed the details of Lewis' accusations against Plaintiff. In response, Plaintiff explained that she was overwhelmed by her workload and lack of support she received from Lewis. At this time, Plaintiff experienced severe headaches, neck pains, vision issues, and insomnia.

34.     In May 2020, Plaintiff engaged in further protected activity by filing a formal HR complaint regarding the PDP and ongoing harassment to which she was subjected by Lewis. Plaintiff also expressed concern over the legitimacy of Lewis' performance-related accusations against Plaintiff. Plaintiff further explained that Lewis failed to provide written documentation to substantiate the PDP, such as metrics or negative feedback received by other employees, and that Lewis constructed evidence by piecing together irrelevant emails and described Plaintiff as defensive, emotional, and unable to control herself. Lewis' evidence, which took her approximately three months to produce, also contradicted the instructions Lewis provided to Plaintiff during the time of the alleged issues. As a result, Plaintiff experienced more frequent severe headaches and dizzy spells similar to vertigo.

35.     In June 2020, Plaintiff attended a meeting via Microsoft Teams with Lewis and HR, during which Lewis presented documentation concerning Plaintiff's PDP. Notably, part of the PDP required Plaintiff to obtain performance feedback from her colleagues. Thereafter, Plaintiff discussed her PDP with Powell, who expressed concern regarding who would be permitted to contribute feedback and encouraged Plaintiff to speak to HR about the situation.

36.     Following the meeting, Lewis provided Plaintiff with a list of colleagues from whom she could obtain feedback. Significantly, Lewis subsequently reduced the list by half to include only employees with whom Lewis maintained a close relationship. Lewis also connected Plaintiff to a "senior leader" who also suffered from Dyslexia and discriminatorily requested that HR address Plaintiff's disability.

37.     Around the same time, Plaintiff grew concerned that the issues she raised about her workload were not addressed by the PDP and spoke with Senior Leader Chantal Robinson ("Robinson") regarding her medical disability. During the conversation, Robinson discriminatorily accused Plaintiff of exhibiting communication issues and questioned when Plaintiff was diagnosed with Dyslexia. Notably, Robinson was a close friend of Lewis and therefore, Plaintiff was concerned that she confided in Robinson and that such conversation would result in further harassment from Lewis.

38.     In August 2020, Plaintiff applied for intermittent FMLA leave in connection with her medical conditions. HR spoke to Plaintiff about her FMLA leave and encouraged her to report any contact from Lewis while she was out on leave.

39.     Around the same time, Plaintiff submitted the feedback survey required by Lewis in connection with Plaintiff's PDP. Notably, Plaintiff provided multiple examples of positive feedback that she received from colleagues. However, some of the other colleagues, who were close friends with Lewis and spoke directly with Lewis in private conversations, provided comments that were inappropriate or bizarre, such as describing Plaintiff as "flaky" or petty name-calling with little to no mention of Plaintiff's actual performance.

40.     Prior to the start of her leave period, Plaintiff met with Lewis, Allen, and Head of Sector Dana Dickerson ("Dickerson") to discuss her FMLA request after Lewis discriminatorily

raised concern to HR regarding Plaintiff's FMLA leave. Notably, this meeting was encouraged by HR, who advised Plaintiff that she was not required to disclose any details about her disability if she had chosen not to. During said meeting, Lewis claimed that she was concerned that Plaintiff's leave would negatively impact the department. Lewis then inappropriately required Plaintiff to discuss her medical conditions. In response, Lewis made comments about having migraines herself and questioned Plaintiff's treatment. Plaintiff reported the conversation to Personal Development Coach Alison Stokes ("Stokes") and noted her discomfort. Rather than ameliorating the situation, Stokes merely advised Plaintiff to accept criticism over the feedback survey and being referred to as "flaky."

41.     In October 2020, Plaintiff completed a business strategy document and received positive feedback from Macleod. Notably, her document was described as "an example of how to create a robust strategy." Lewis was present when Plaintiff received said feedback.

42.     In February 2021, Lewis intentionally prevented Plaintiff from timely submitting a brief in connection with the UK Ambassador to the United States' Estee Lauder event. Specifically, Lewis refused to review the brief until Plaintiff finalized the document. Plaintiff followed protocol regarding the brief, such as highlighting in red any missing information and requested that Lewis review it before Plaintiff submitted it to senior leaders. Nevertheless, Lewis intentionally stalled reviewing the brief, which caused Plaintiff to submit the brief after the deadline.

43.     At the end of March 2021, the British Fashion Council Grant was terminated. Defendants then instructed Plaintiff to inform the client. Plaintiff expressed concern about relaying this information to the client without the support of senior management since the team worked on that grant for one year. Notably, Plaintiff took steps regarding the contract termination by first

asking the client if there was any way the team could meet alternate deadlines to avoid termination. Lewis then instructed Plaintiff to tell the client that the contract was terminated due to a "breach in contract." Plaintiff asked whether Defendants could first consult with the legal team regarding the breach of contract claim and indicated she did not feel comfortable giving the client that information without receiving confirmation from legal. Dickerson then provided Plaintiff with a letter stating that the termination was a result of a contract breach. After Plaintiff spoke with the client, she again asked that a senior manager issue the letter and reiterated her concerns about failing to include input from legal. Plaintiff called the client again; however, Dickerson intervened and told the client that the grant would be terminated.

44.     Subsequently, Lewis advised Plaintiff that she would be disciplined for failing to issue the letter and claimed that Plaintiff was legally responsible for the grant because of such failure. Plaintiff reported Lewis' comments to senior leadership and clarified the situation. Defendants then retaliated against Plaintiff by prohibiting her from speaking with the client and issuing her a formal written disciplinary citation. Notably, the client, who previously interacted with Plaintiff on other matters, expressed confusion by the sudden cease in communication. On multiple occasions, Plaintiff expressed concern to senior management regarding the matter; however, Lewis instructed Plaintiff to "drop it" and cease all communications with the client.

45.     Subsequently, Plaintiff's PDP was set to expire and there was no reason provided as to why she would be issued another PDP during the following appraisal cycle. Lewis grew frustrated over the positive feedback Plaintiff received from a client, who praised Plaintiff's work and qualifications.

46.     Shortly thereafter, Plaintiff applied for a Director position in Defendant UKDIT's Consumer Goods sector. Significantly, Defendants only afforded Plaintiff twenty (20) minutes to

complete her application whereas Defendants afforded another non-disabled applicant, who did not complain about discrimination, 24 hours to complete said application. Furthermore, Defendants discriminatorily and retaliatorily denied Plaintiff an interview despite that it interviews are typically granted to all internal candidates with the exception of those on a formal performance review. Upon information and belief, Lewis pushed the formal written warning and PIP against Plaintiff to further block her from interviewing.

47.     On May 6, 2021, Regional Director Fiona Macleod ("Macleod") and Deputy HR Director Chris Ramm ("Ramm") issued Plaintiff a formal written disciplinary citation based upon the above-mentioned accusations against Plaintiff in connection with the grant termination. Defendants' actions were in furtherance of its discriminatory and retaliatory animus against Plaintiff.

48.     On May 10, 2021, Plaintiff engaged in further protected activity by meeting with Deputy Consul General Kunal Khatri ("Khatri") and Acting Consul Hannah Young ("Young") regarding Lewis' discriminatory and retaliatory behavior.

49.     Around the same time, Plaintiff had a performance review meeting with Lewis. During said meeting, Lewis informed Plaintiff that her PDP was escalated to a Performance Improvement Plan ("PIP"). Notably, Dickerson had left her employment with Defendants before the PDP was issued and therefore, could not sign off on it. Significantly, Lewis failed to provide Plaintiff with written documentation regarding the PIP and behaved aggressively towards Plaintiff during the meeting. Lewis primarily attributed the PIP to the grant termination issue. Lewis also withheld positive feedback that Plaintiff received and pretextually accused Plaintiff of failing to understand her job duties and/or how to speak to retail buyers, "severely underperforming," and

"overstepping boundaries." Notably, Defendants issued Plaintiff the PIP less than four working days after the formal written warning was issued.

50.     After this conversation, Plaintiff reached out to other colleagues, who indicated that she (Plaintiff) and Allen performed at or above every other team in the department, which further supports that Lewis' manufactured the performance-related accusations against Plaintiff in furtherance of her discriminatory and retaliatory animus against Plaintiff.

51.     On May 11, 2021, Plaintiff requested copies of documents from her personnel file so that she could file a formal grievance regarding the ongoing discrimination, harassment, and retaliation to which she was subjected. HR improperly denied Plaintiff's request on the pretextual basis that employees could not obtain copies of documents contained in their personnel file.

52.     On May 14, 2021, Plaintiff sent a demand letter to Antony Philipson. HR then responded to Plaintiff's request to file a formal grievance.

53.     On May 19, 2021, Plaintiff responded to her performance review and PIP by submitting required comments and explained how the meeting with Lewis regarding these purported issues was aggressive and hostile. Plaintiff also noted that Lewis intentionally withheld positive feedback that she had received about Plaintiff's performance. Thereafter, Plaintiff emailed submitted said response to HR.

54.     On May 20, 2021, Philipson responded to Plaintiff's demand letter. Plaintiff then utilized vacation time until May 28, 2021. Notably, Plaintiff's vacation was pre-planned before receiving the formal written warning and PIP.

55.     On May 21, 2021, while Plaintiff was on vacation, Lewis harassed Plaintiff regarding her performance appraisal and HR complaints. Lewis then explained the formal complaint and appeal process to Plaintiff and sent Plaintiff a new PIP document containing new

accusations that Plaintiff needed to develop how she processed information and recalled details. In total, Lewis revised the PIP issued to Plaintiff four times and each time, Lewis added additional pretextual performance-related accusations against Plaintiff. Evidently, Lewis' actions were a result of her discriminatory and retaliatory animus against Plaintiff.

56.     On May 24, 2021, HR sent Plaintiff an email regarding her PIP. Significantly, HR's email was nearly identical to the email Plaintiff received from Lewis.

57.     On May 25, 2021, Plaintiff met with her doctor regarding her medical conditions, which were exacerbated by the stress caused by Defendants. Plaintiff's doctor changed her medication and agreed to sign off on Plaintiff's request for a medical leave of absence from work.

58.     On June 1, 2021, Plaintiff returned to work and notified HR that she required an extended leave of absence related to health issues and noted that said medical conditions were exacerbated by work-related stress caused by Lewis' ongoing harassment. Later that day, Defendants issued Plaintiff the formal PIP and instructed her to report to a meeting on the following day to review the PIP with management and HR.

59.     Between June 2, 2021, and June 4, 2021, Plaintiff utilized intermittent FMLA leave.

60.     On June 7, 2021, Plaintiff informed HR that she needed to use intermittent FMLA from June 9, 2021, until June 24, 2021, to treat her medical conditions.

61.     On June 22, 2021, Plaintiff reached out to HR advising that she needed to extend her FMLA leave by two more days. HR advised Plaintiff that if her FMLA leave went beyond this, she would be required to fill out additional paperwork.

62.     At the end of June 2021, Plaintiff returned to work and requested that HR push back the PIP meeting to give her the opportunity to catch up on emails she received while on FMLA leave. HR denied this request and directed Plaintiff to attend the meeting as scheduled. During said

meeting, HR advised Plaintiff that she was prohibited from speaking about any evidence showing that she performed well and directed her not to discuss her disagreement of the PIP.

63.     Subsequently, Plaintiff began working on the additional tasks she was required to perform pursuant to the PIP on top of her regular work. During brief writing training, which was one of the tasks she was required to perform pursuant to the PDP, Head of Events Alyssa Elienfeldt confirmed that Plaintiff followed proper procedure when drafting briefs.

64.     On July 20, 2021, Lewis harassed Plaintiff concerning her calendar. Specifically, on said date, Plaintiff and Allen changed Plaintiff's calendar permissions to allow Allen to lead Teams calls while Plaintiff was away or handling another call. Within 30 minutes, Lewis emailed Plaintiff scolding her for changing her calendar permissions because she (Lewis) was unable to see Plaintiff's activity because of the change. Lewis then retaliated against Plaintiff by filing an HR complaint falsely accusing Plaintiff of being "non-compliant" despite that Plaintiff had already changed her calendar back to the original settings.

65.     On July 26, 2021, during their PIP check-in meeting, Lewis again mentioned the calendar issue. Plaintiff then met with an HR representative regarding Lewis' complaint. During said meeting, the HR Representative accused Plaintiff of being "passive aggressive" and stated that due to her deficient performance, Lewis' scrutiny concerning Plaintiff's calendar was "warranted."

66.     During July and August 2021, Young emailed staff members seeking suggestions for potential events during New York Fashion Week. Significantly, Defendants intentionally excluded Plaintiff from said emails and relevant meetings. Defendants further retaliated against Plaintiff by removing her as the main point of contact on several projects in attempt to alienate and sabotage Plaintiff's professional relationships with outside companies.

67.     On August 1, 2021, Plaintiff filed another formal complaint with HR regarding the relentless harassment to which she was subjected by Lewis.

68.     On August 6, 2021, HR informed Plaintiff that her multiple complaints could not be substantiated. During the meeting, HR illogically claimed that Defendant UKDIT was unaware of Plaintiff's disability (Dyslexia) despite that Plaintiff disclosed her diagnosis to Lewis and discussed such in the presence of HR. Subsequently, Plaintiff submitted her formal written response the performance review she received from Lewis.

69.     Later that day, Defendants constructively terminated Plaintiff's employment by failing to ameliorate the ongoing discrimination, harassment, and retaliation to which she was subjected. Plaintiff agreed to continue working until September 14, 2021.

70.     On August 9, 2021, during a team meeting, MacLeod announced that Plaintiff's last day of employment would be September 14, 2021.

71.     On August 15, 2021, Macleod directed Plaintiff to attend an HR meeting the following day.

72.     On August 16, 2021, Plaintiff met with Macleod and HR via Microsoft Teams. During said meeting, Macleod informed Plaintiff that Defendants no longer required her services. Significantly, Defendants afforded Plaintiff less than two hours to complete HR termination documents. Though Plaintiff expressed concerns regarding Lewis' discriminatory treatment, HR Director Carolyn Wall instructed other senior leaders to "just tell her [Ms. Bell] that they agreed with Lewis."

73.     Based upon the foregoing, Defendants discriminated against Plaintiff based upon her disability and retaliated against her following her engagements in protected activity when she complained about the discrimination, harassment, and retaliation to which she was subjected.

Defendants treated Plaintiff differently as compared to similarly situated non-disabled employees, who did not complain about discrimination, with respect to their terms and conditions of employment. These actions of discrimination and retaliation substantially interfered with Plaintiff's employment.

**FIRST CAUSE OF ACTION AGAINST DEFENDANTS**
**(DISCRIMINATION IN VIOLATION OF N.Y. EXEC. LAW § 296)**

74.     Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

75.     Defendants' discrimination concerned activities protected by New York Executive Law § 296.

76.     The New York State Human Rights Law, N.Y. Exec. Law § 296 provides, in pertinent part: "It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

77.     Plaintiff is a member of a protected class pursuant to N.Y. Exec. Law § 296, namely Plaintiff suffers from Dyslexia and chronic migraines with auras.

78.     Defendants were aware of Plaintiff's disability as Plaintiff disclosed said information to Lewis and HR.

79.     Plaintiff possessed proper qualifications for Defendants to continue her employment. Specifically, Defendants routinely issued Plaintiff exemplary performance evaluations throughout her tenure and promoted her to a management-level position in April 2019.

80.     Defendants and/or their agents subjected Plaintiff to adverse action after she disclosed her medical disability by: (1) falsely accusing her of performance deficiencies and harassing her regarding same; (2) increasing Plaintiff's workload and failing to provide her with the support she required to carry out her job duties; (3) placing Plaintiff on a PDP and subsequently escalating said PDP to a PIP based upon pretextual performance-related accusations despite that Plaintiff received positive performance feedback from leadership, clients, and direct reports; and (4) constructively terminating Plaintiff's employment by failing to ameliorate the relentless discrimination, harassment, and retaliation to which she was subjected.

81.     As a direct and proximate result of Defendants' unlawful conduct in violation of N.Y. Exec. Law §296, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

82.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of N.Y. Exec. Law §296, Plaintiff suffered and continues to suffer mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

### SECOND CAUSE OF ACTION AGAINST DEFENDANT
### (DISCRIMINATION IN VIOLATION OF N.Y. ADMIN. CODE § 8-107)

83.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

84.     Defendants' discrimination concerned activities protected by New York City Administrative Code § 8-107.

85.     The New York City Human Rights Law, N.Y. Admin Code 8-107 provides, in pertinent part: "It shall be an unlawful discriminatory practice: (a) For an employer or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual orientation, uniformed service or alienage or citizenship status of any person: (i) To represent that any employment or position is not available when in fact it is available; (ii) To refuse to hire or employ or to bar or to discharge from employment such person; or (iii) To discriminate against such person in compensation or in terms, conditions, or privileges of employment."

86.     Plaintiff is a member of a protected class pursuant to N.Y. Admin Code 8-107, namely Plaintiff suffers from Dyslexia and chronic migraines with auras.

87.     Plaintiff possessed proper qualifications for Defendants to continue her employment. Specifically, Defendants routinely issued Plaintiff exemplary performance evaluations throughout her tenure and promoted her to a management-level position in April 2019.

88.     Defendants and/or their agents subjected Plaintiff to adverse action after she disclosed her medical disability by: (1) falsely accusing her of performance deficiencies and harassing her regarding same; (2) increasing Plaintiff's workload and failing to provide her with the support she required to carry out her job duties; (3) placing Plaintiff on a PDP and subsequently escalating said PDP to a PIP based upon pretextual performance-related accusations despite that Plaintiff received positive performance feedback from leadership, clients, and direct reports; and (4) constructively terminating Plaintiff's employment by failing to ameliorate the relentless discrimination, harassment, and retaliation to which she was subjected.

89.     As a direct and proximate result of Defendants' unlawful conduct in violation of N.Y. Admin Code 8-107, Plaintiff has suffered and continues to suffer monetary and/or economic

damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

90.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of N.Y. Admin Code 8-107, Plaintiff suffered and continues to suffer financial hardship, mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION AGAINST DEFENDANT
## (RETALIATION IN VIOLATION OF N.Y. EXEC. LAW § 296)

91.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

92.     Defendants' discrimination concerned activities protected by the New York Executive Law § 296(7).

93.     The New York State Human Rights Law, N.Y. Exec. Law § 296(7) provides in pertinent part that, "It  shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because  he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

94.     In May 2020, Plaintiff engaged in protected activity by filing a formal HR complaint regarding her placement on the performance improvement/development plan and the disability discrimination to which she was subjected by Lewis. Thereafter, on multiple occasions, Plaintiff engaged in further protected activity by filing additional discrimination and retaliation complaints with HR.

95.     Defendants were aware of Plaintiff's engagements in protected activity as Lewis and HR addressed said complaints directly with Plaintiff.

96.     Defendants and/or their agents subjected Plaintiff to adverse action by: (1) falsely accusing her of performance deficiencies and harassing her regarding same; (2) increasing Plaintiff's workload and failing to provide her with the support she required to carry out her job duties; (3) placing Plaintiff on a PDP and subsequently escalating said PDP to a PIP based upon pretextual performance-related accusations despite that Plaintiff received positive performance feedback from leadership, clients, and direct reports; and (4) constructively terminating Plaintiff's employment by failing to ameliorate the relentless discrimination, harassment, and retaliation to which she was subjected.

97.     Defendants took these adverse actions shortly after Plaintiff's engagements in protected activity.

98.     As a direct and proximate result of Defendants' unlawful conduct in violation of N.Y. Exec. Law §296, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

99.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of New York Executive Law § 296(7), Plaintiff suffered and continues to suffer financial hardship, mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION AGAINST DEFENDANT
### (RETALIATION IN VIOLATION OF N.Y. ADMIN. CODE § 8-107(7))

100.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

101.    Defendants' discrimination concerned activities protected by N.Y. Admin Code § 8-107(7).

102.    N.Y. Admin Code § 8-107(7) provides in pertinent part that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter . . . The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment… in a materially adverse change in the terms and conditions of employment…provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

103.    In May 2020, Plaintiff engaged in protected activity by filing a formal HR complaint regarding her placement on the performance improvement/development plan and the disability discrimination to which she was subjected by Lewis. Thereafter, on multiple occasions, Plaintiff engaged in further protected activity by filing additional discrimination and retaliation complaints with HR.

104.    Defendants were aware of Plaintiff's engagements in protected activity as Lewis and HR addressed said complaints directly with Plaintiff.

105.    Defendants and/or their agents subjected Plaintiff to adverse action by: (1) falsely accusing her of performance deficiencies and harassing her regarding same; (2) increasing Plaintiff's workload and failing to provide her with the support she required to carry out her job duties; (3) placing Plaintiff on a PDP and subsequently escalating said PDP to a PIP based upon pretextual performance-related accusations despite that Plaintiff received positive performance feedback from leadership, clients, and direct reports; and (4) constructively terminating Plaintiff's employment by failing to ameliorate the relentless discrimination, harassment, and retaliation to which she was subjected.

106.    Defendants took these adverse actions shortly after Plaintiff's engagements in protected activity.

107.    As a direct and proximate result of Defendants' unlawful conduct in violation of N.Y. Admin Code 8-107, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

108.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Admin, Code § 8-107, Plaintiff suffered and continues to suffer financial hardship, mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by the New York State Human Rights Law, N.Y. Exec. Law 290. *et seq*., and the New York City Human Rights Law, N.Y. Admin Code 8-107, *et seq.* by discriminating against Plaintiff based on

her disability and retaliating against her following her engagements in protected activity;

B.      Awarding Plaintiff compensatory damages for lost wages, mental, emotional, and physical injury, distress, pain and suffering, and injury to her reputation in an amount to be proven;

C.      Awarding Plaintiff punitive damages;

D.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

E.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendants' unlawful employment practices.


Dated:  New York, New York
        December 20, 2022


                                        WHITE & HILFERTY


                        By:     _____
                                Samantha E. Hudler
                                *Attorneys For Plaintiff*
                                757 Third Avenue, 20th Floor
                                New York, NY 10017
                                Tel: (917) 565-8763

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

ASHLEY BELL,

                                                                     Case No.:

                        Plaintiff,

                -against-                            **VERIFICATION**

UK DEPARTMENT FOR INTERNATIONAL TRADE,

                        Defendant.

------------------------------------------------------------------------X

      **ASHLEY BELL**, pursuant to the provisions of 28 U.S.C. 1746, declares the following under penalty of perjury that the foregoing is true and correct:

      1.      I am the Plaintiff herein.

      2.      I have read the foregoing Complaint and know the content thereof, that the same is of my own knowledge except as to the matters therein stated upon information and belief; and that as to those matters, I believe the same to be true.

Executed:      New York, New York
                   December _20_, 2022

                                                          _____

                                                       **ASHLEY BELL**